G67nkumc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

OLGA KUNINA,

             Plaintiff,

        v.                      15 Civ. 4755 (KBF)

7 WEST 82ND LLC, MICHAEL
KADOE,

             Defendant.

------------------------------x

                              New York, N.Y.
                              June 7, 2016
                              3:40 p.m.

Before:

             HON. KATHERINE B. FORREST,

                              District Judge

                    APPEARANCES

JOSEPH MURE JR. & ASSOCIATES
    Attorneys for Plaintiff
BY:  DAVID C. CASAGRANDE

REBORE, THORPE & PISARELLO, P.C
    Attorneys for Defendants
BY:  TIMOTHY J. DUNN III

1      (Case called)

2      THE COURT:  As you folks know, you are transferred in

3   from Judge Scheindlin.  We set a schedule, and you had been

4   working under her schedule before.  Why don't you tell me if

5   there is anything sort of that I should know about where things

6   stand or where things are going.

7      MR. DUNN:  Your Honor, if I may?

8      THE COURT:  Yes.

9      MR. DUNN:  The parties had a private mediation a few

10  weeks ago.  Counsel was there, as was I, and there is an

11  insurance carrier involved.  They were there.

12      A monetary amount was agreed subsequent to that

13  mediation after the parties went back and forth and counsel and

14  I communicated.  We were in agreement on a monetary settlement.

15  The devil is in a few of the small details that remain.  I

16  don't know if your Honor recalls much of the background of this

17  case since you haven't handled it since its inception, but the

18  claim is essentially that the plaintiff was unlawfully

19  surveilled in my client's building.

20      My client's brother, who is a nonparty, pled guilty to

21  a felony unlawful surveillance of the young lady in the

22  bathroom.  I will spare you the gory details.

23      THE COURT:  I read the complaint.

24      MR. DUNN:  That is essentially the gist of the case.

25      One of the issues for my client has been that this

G67nkumc

matter made its way into the media with his name attached to it, although the events in question did not take place in his apartment or in his bathroom.  They were in the bathroom and apartment of his brother.  So he has some concerns about his good name.

I have tried to iron this out.  In the course of exchanging an anticipatory settlement documents, counsel has asked for mutual releases of the parties and the counsel involved, and my client has expressed concern about that and concern about his rights in that regard.  He feels that he was defamed at some point.

If he was, the statute of limitations on that likely runs out in a week, and he's been advised of that, and I am not going to be his lawyer if that ever goes anywhere.  My hope is that this problem would solve itself at some level, and we would be able to work it out between us.

We are close, but in the interim he's asking me for things that aren't really recognized items of relief.  It is comical for me to say maybe, but he is looking for a kind of justice that I don't think the Court can necessarily easily deliver.  My hope was that we might be able to make some headway on just ironing out that detail, which is one detail, and it is not a small one, but it may be a solvable problem in my estimation.

The remainder of the case, there is a little bit of

G67nkumc

| | |
|---|---|
| 1 | discovery to be jammed in the next couple of days which we have |
| 2 | scheduled.  If we have to go forward, I would like and I think |
| 3 | plaintiff would like to avoid a few days of unnecessary work if |
| 4 | it is not going to benefit our clients. |
| 5 | That's where we are at. |
| 6 | THE COURT:  I hear you.  Sometimes things get |
| 7 | complicated. |
| 8 | MR. DUNN:  Clients. |
| 9 | THE COURT:  Yes. |
| 10 | Let me ask you about two possibilities, because your |
| 11 | client is not unusual in feeling when it's personal that there |
| 12 | is something else and they just don't know where to put that |
| 13 | view.  They don't know what bucket to put it in.  Is it a legal |
| 14 | right that they can proceed with or something else. |
| 15 | What I am wondering -- it would be bad, I think, for |
| 16 | your client if your client does not -- let me put it |
| 17 | differently.  More press on this case would not do your client |
| 18 | any good. |
| 19 | The public apology, for instance, would not do your |
| 20 | client any good because all that would do is remind everybody |
| 21 | about what he had been perhaps associated with in some nebulous |
| 22 | or not so nebulous sense.  So that's one thing. |
| 23 | But is it possible that there are things that are what |
| 24 | I would consider to be sort of public statements of lack of any |
| 25 | kind of liability that could be made on a public record, if he |

G67nkumc

1    ever wanted to or had to have it, in exchange for a release

2    that would be there.  In other words, a stipulation where

3    everybody agrees that in release of the settlement there will

4    be a public statement on the record that he had nothing to do

5    with this, so that there is a transcript page which, if he ever

6    wanted to look at it, would say there are no facts in the

7    record at this time that indicate that Mr. Kadoe had anything

8    to do with this.

9           Would that be acceptable do you think?

10          The alternative would be -- let me give you another

11   version, I am trying to be creative here -- which is, in

12   exchange for a signed release, but before the case is

13   dismissed, so you would have to have it locked and loaded he's

14   dismissed from the case with prejudice.  And then after that,

15   so he has the benefit of a public dismissal of the case, he's

16   out of the case and gone, then the case is finally so ordered

17   in terms of an overall settlement and there can be a delay of

18   some days, a week, a month.

19          Those are two concepts.

20          What do you guys think.  I am assuming now that nobody

21   thinks Mr. Kadoe had anything do with this.

22          MR. CASAGRANDE:  I don't believe we are willing to go

23   that far with it.  The girl has resided in his building as part

24   of her employment for him.  There is testimony on depositions

25   that he was in and out of that apartment in and out of the

G67nkumc

1    bathroom where the cameras were.

2           But putting that to the side and trying to get this

3    matter settled, because counsel and our firm worked pretty hard

4    over the last month to get to this point, and to see it kind of

5    fall apart at the finish line stings a little bit.  The

6    position coming from our side and our firm would be, as long as

7    there is a release of all the claims arising from here, which

8    would include the defamation claim, we're pretty open to,

9    however, what we need to get to where we need to get.

10          (Mr. Kadoe present)

11          THE COURT:  Is this somebody with the case as well?

12          Come on in, please.

13          MR. DUNN:  This is Mr. Kadoe, who is my client.

14          THE COURT:  You are the named defendant?

15          Go ahead and have a seat, sir.

16          MR. CASAGRANDE:  The matter of his defamation suit has

17   been brought up going back as far as I believe December 2014.

18          This isn't something that just kind of came out of

19   nowhere.  Again, it wasn't brought -- there is a coexistent

20   state case, I am not sure if your Honor is aware of it, and

21   also this one.  It wasn't brought in response to the complaint

22   here.  And to kind of hold this up, like I mentioned before,

23   kind of stings.

24          If we can get to point where we could release all the

25   claims and the issue completely -- we are open to any sort of

G67nkumc

1    scenario that gets us to that point.  You laid out two options.

2    We are not against it, as long as the releases are there.

3         THE COURT:  I see Mr. Kadoe is here, which is very

4    helpful.

5         Let me make sure that I understand the state of play.

6         The complaint makes certain allegations.  Mr. Kadoe is

7    named as a defendant in the complaint.  That causes Mr. Kadoe

8    great concern, and he would like to do something to resolve

9    that in a sense that's greater than paying the plaintiff money

10   but is in a sense of clearing his name.

11        MR. CASAGRANDE:  Sure.

12        THE COURT:  The issue, as you folks know, it's next to

13   impossible to settle a case without a full release.  It just

14   really often doesn't happen.

15        In the situations where it happens, where you have

16   something less than a full release, they are usually quite

17   unusual situations where there is a known claim that is going

18   to be pursued and everybody agrees for whatever reason that

19   that can happen.

20        However, I can't imagine you would guys would get any

21   money across the table if that kind of claim is kept here.  In

22   other words, you are not going to get a release here that got a

23   carveout, I don't think.  It would be the kind of thing that

24   would be very so unusual as to be something I've not seen in

25   this kind of case.

G67nkumc

1          The problem with the carveout -- because ultimately

2     this is going to be Mr. Kadoe's decision and your decision in

3     counsel with you folks, the problem with a carveout here -- and

4     then I want to describe a couple of options -- is that the kind

5     of claim that would be brought would be, I would assume, like a

6     defamation claim.

7          If that were brought, it's very public, and truth is a

8     defense.  I am not suggesting for a moment, Mr. Kadoe, that I

9     think there's any truth to it.  I have no idea what the facts

10     are.  I am going to assume for a moment that there is no truth

11     to it.  All I know is that they are ugly.

12          I can tell you from my point of view as a judge that

13     defamation cases often become very complicated.  Because what

14     happens is the people who bring the claim want to clear their

15     name, but to do that, there is even more mud created, because

16     the other side then has to drag up every fact they ever had, no

17     matter how tenuous or circumstantial.  In other words, so and

18     so was in and out of the apartment, so and so must have used

19     the bathroom -- I mean, I am just grabbing things -- and it

20     becomes even uglier.  I have in my experience seen a number of

21     defamation claims which only make the situation worse.

22          So that's part of the problem, is that it can make a

23     situation that's not ideal to begin with even worse.  So we

24     have to, I would think, proceed very carefully, because it's

25     Mr. Kadoe's name here and he does not want his name sullied in

G67nkumc

1   his view in the way it's been sullied so far or further.  Now,

2   here would be I think two suggestions.

3           I don't know which way the money is going, if it is

4   going to be the insurer and the insurance company, or how it's

5   going to work.  That's where it is going to come from?

6           MR. DUNN:  Yes.

7           THE COURT:  One thing we could do is that Mr. Kadoe is

8   dismissed from the case immediately saying that there has been

9   no finding of liability against him, dismissed, and then the

10  Court would say separately, if there is any basis, as I always

11  do in a 30-day order that would be a separate order, to have to

12  rejoin him if the settlement fell apart, that could be done

13  within 30 days.  Otherwise he's dismissed from the case

14  entirely, and it's just the insurer that is on the hook, which

15  is the LLC.

16          MR. DUNN:  The LLC is insured by a private account.

17          THE COURT:  Right.  So it would be a one-line thing,

18  Mr. Kadoe, that there is no finding of liability against

19  Mr. Michael Kadoe, and he is thereby dismissed from this case

20  with prejudice.

21          If that would be acceptable, that is as close as we

22  get in the Court without a trial to clearing somebody's name.

23  The case is still alive.  So it's clear that the case is alive,

24  but he's gone.

25          Then if the settlement were to fall apart for some

G67nkumc

```
1    reason within 30 days, there is a separate order that would
2    allow him to be rejoined, but everybody would acknowledge
3    publicly that that's not really expected.
4              That is one option.  Another option would be a
5    stipulated fact, which is there would be an agreement on the
6    record that there are insufficient facts at this time, that
7    wouldn't work, that there is essentially the same thing, there
8    has been no judicial finding that Mr. Kadoe is liable in any
9    way for the acts that underlie this complaint.
10             And that's true.  There has been no finding that he's
11   had anything to do with this.  You may have your views.  The
12   plaintiff may believe it's got circumstantial evidence or not,
13   but there's been no judicial finding and that there would be a
14   public stipulated fact to that effect.
15             That way it is there.  One thing I was saying,
16   Mr. Kadoe, before you came in, is that in these kinds of cases
17   it's frankly very difficult.
18             I understand you are in a very difficult bind because
19   if you do anything publicly that you make public, all it does
20   is remind the public of the situation.  Because in order to
21   have any context, you would have to tell the press, oh, by the
22   way, remember how they accused me of X, Y, or Z.  Well, now, I
23   have something that says I didn't do it.
24             All the press is going to care about is that you were
25   accused of X, Y and Z, because it is just the way it works.
```

G67nkumc

1    Your innocence doesn't interest them.  It is the accusation.

2    So all it would do, and I've seen it before -- the news cycle

3    is a vicious thing.

4         So I am trying to think of something which you could

5    use if you ever wanted to, and if anybody ever raised it with

6    you, you would say I've got a Court judgment right here or I've

7    got a court statement right here.  What do you folks think

8    about these?

9         I am trying to think of something under the radar yet

10   he could use it publicly if he so chooses.

11        MR. CASAGRANDE:  Like I mentioned before, we are open

12   to any sort of way that we can get there.

13        THE COURT:  Are any of these acceptable to you?

14        MR. CASAGRANDE:  Either would be fine, but each with

15   caveat that there is going a mutual release of all the claims.

16        THE COURT:  Well, that would be the idea.  Mr. Kadoe

17   would have to agree, but that would be the idea.

18        MR. CASAGRANDE:  Us knowing that he wants to bring a

19   suit against our client, in good faith we couldn't enter into

20   it knowing other clients are going to get sued back.  It would

21   be a borderline malpractice issue at that point.

22        THE COURT:  I take it that you guys explained to

23   Mr. Kadoe, when I say truth is a defense to defamation I am not

24   suggesting that there is any truth to it.  What I am suggesting

25   is, you know how these cases go, if you bring the defamation

G67nkumc

1    claim, the first line of defense is there was enough there to

2    bring a lawsuit.

3            So, your defamation suit, the answer to it, the Court

4    document that is filed to respond to it, puts in all of the

5    arguments about why you were somehow attached to it.  It

6    doesn't help it.  It makes it worse.

7            Then you are going to be like, Oh, my God.  Now I have

8    to try this case.  Now I have to go to trial, and it's very

9    messy.

10           I'm not saying it's not tempting.  I am just telling

11   from you my experience it can get ugly.

12           MR. KADOE:  Can I talk?

13           THE COURT:  You can say something.

14           MR. KADOE:  It is not only me, even the LLC has

15   nothing do with it.  It is not only clearing my name.  The LLC

16   is a rental property.  I have a five vacancies thanks to what

17   happened.  People who Google the name, right away they think,

18   Oh, you are this landlord.  It hurts my reputation, it hurts my

19   kids, it hurts my family.

20           THE COURT:  This is the kind of statement where I am

21   trying to think of something that would come up with a Google

22   search, right?

23           MR. KADOE:  Yes.

24           THE COURT:  First of all, there are press releases

25   that can be created that you can make sure that they then come

G67nkumc

```
1   up on a Google search so that when your company gets Googled,
2   the LLC gets Googled, it comes up right away, this press
3   release saying there has been no finding that the LLC or
4   Mr. Kadoe had anything at all to do with this, and that would
5   be featured prominently.  There are ways in which an
6   advertising company, what they do is they make sure that the
7   Google result comes up first.
8           MR. KADOE:  I looked into it, your Honor.  You are
9   talking about $50,000, $60,000 for the first year.  It may push
10  the news down like maybe one page.  So $60,000 a year for
11  something I didn't do anything.
12          THE COURT:  You could personally go on, by the way --
13  I will just tell you this.  You could click whatever is above
14  that, let's say the bad result is result No. 2.  As long as you
15  just click on the good result so many times it makes the next
16  result pop up and so --
17          MR. KADOE:  I tried.  It is my routine every day to
18  look into the Internet, and honestly I have been hurt every
19  single day.
20          THE COURT:  I do understand.  You are experiencing
21  something that is on a human level.  I absolutely understand.
22          The problem is that for the lawsuit by Olga Kunina --
23  I don't know how to pronounce her name.
24          MR. DUNN:  That's correct, your Honor.
25          THE COURT:  That lawsuit, I don't know that it's one
```

G67nkumc

1    you want to go to trial on.  I am not talking about you

2    personally.  I am talking about the LLC, because it depends on

3    what the facts are.  I haven't gotten deeply enough into the

4    facts to know.

5           I am not suggesting that you don't have a good defense

6    for the LLC.  I am saying you will be in front of the jury, and

7    that has complexity to it.

8           MR. KADOE:  Your Honor, it cannot be that somebody who

9    did nothing is getting hurt and that somebody had made all

10   those malicious lies is walking away smiling.

11          THE COURT:  Who did the malicious lies?

12          MR. KADOE:  All of them.  Number one and the two other

13   girls.

14          THE COURT:  You are saying there is no truth to any of

15   it?

16          MR. KADOE:  Any of it.  Olga never worked for me.  She

17   was working as an au pair.  She is the LLC brought her to the

18   U.S.  It is a lie.  She worked as an au pair.  She got money

19   for an au pair from our personal money.  Whenever there was an

20   occasion she cleaned an apartment, I paid her.

21          When this happened, she was not working for me at all.

22   She stayed as a guest in my brother's apartment.  That's where

23   it happened.

24          So she sued the LLC.  The LLC had nothing do with

25   that.  She didn't work for me.  It is like you have a cleaning

G67nkumc

girl that comes and clean.

She was not the only one.  There are many of them that come and clean that apartment.  It's not me coming to the apartment -- making all those accusations.  She said she had sex in that apartment, that she had her own bedroom, that I gave her an apartment by herself, you know, all lies, one after one.

She changed her testimony three times already, and the other girl as well.  The third time, whenever we present them, she said that she lived in a certain apartment.  When she is presented the least that somebody lived in the apartment for ten years, they changed the fact again, sworn testimony.

Whenever we present them with evidence, they change the facts.  Your Honor, there is surveillance video, security video in the building that you can see that I did not enter that apartment.

THE COURT:  Well, then I hear what you are saying.

MR. KADOE:  They have no -- they tried to tie me into it any way they can, and they couldn't.

Right now I'm the only one hurting.  I'm the only one hurting.  My family is hurting, my kids are hurting.  I am escaping from my own name.  I have to change my name to escape from what they did to me.

THE COURT:  So the LLC, what is your relationship to the LLC?

G67nkumc

```
 1              MR. KADOE:  I am the owner.
 2              THE COURT:  You are the owner.  So it's the insurance
 3    company that had agreed to a monetary settlement.
 4              MR. KADOE:  Yes, your Honor.
 5              THE COURT:  But not the owner, only the insurer.
 6              MR. KADOE:  Yes, your Honor.
 7              They have to clear my name and clear the LLC's name.
 8    I don't care any money that they collect from the insurance.
 9    They don't deserve a penny, because it is all lies, especially
10    the girl who came to the U.S. with the help of attorneys to
11    take advantage of the system.
12              THE COURT:  All right.
13              What I am hearing is that you believe so strongly in
14    the lack of merit, that her case does not have any merit, that
15    if you were going to have write a check you would never write a
16    check for this.
17              MR. KADOE:  Correct.
18              THE COURT:  And if the LLC didn't have the insurance
19    company the LLC would not write a check for this.
20              MR. KADOE:  Correct, your Honor.
21              THE COURT:  Are you not in favor of the settlement?
22              MR. KADOE:  Your Honor, as long as they clear my name
23    completely, my name and the LLC's name completely, that they
24    drop all the charges, and to make a public announcement that we
25    had nothing do with that.
```

1          THE COURT:  So this may be one of those cases -- I'll

2     tell you what I think we need to do.  This needs more of a

3     conversation than the three of us be able to have here.  I

4     think we also have to have the named plaintiff.  I think the

5     plaintiff herself is going to have to appear along with

6     Mr. Kadoe, and I think you need to appear.  What I am going to

7     do is give you a reference to the magistrate judge to have you

8     all sit down in a room together and to hash this out.

9          I am not going to make Mr. Kadoe release something

10    when he obviously feels so emotionally strongly about it, and

11    if he were to make the decision without the insurance company

12    he wouldn't be settling this case.

13         It sounds like what he would do is try the case, go to

14    trial, and have his named cleared in front of the jury.

15    There's always a risk that you would lose, and you would have

16    to be prepared for that.

17         Who is the magistrate in this case?

18         THE DEPUTY CLERK:  Pitman.

19         MR. CASAGRANDE:  Magistrate Pitman.

20         THE COURT:  I don't know if you folks know Magistrate

21    Pitman, but he's very seasoned.  He's very experienced.  He is

22    a serious judge.  He sees a lot of witnesses.  He will be able

23    to assess the personalities in a room at the same time.  But

24    what I think would make sense is to have all of you in a room

25    with the named plaintiff at the same time.

G67nkumc

```
 1              Is there any problem with that?

 2              Mr. Casagrande.

 3              MR. CASAGRANDE:  Your Honor, just the named plaintiff

 4    is in Germany.  She is a German citizen.  There is considerable

 5    expense.

 6              THE COURT:  That is OK.  She's brought a lawsuit.  She

 7    would have to go to trial.  We could do it at the same time as

 8    the trial date so she can come and either appear for trial or

 9    she can have the settlement conference and if that doesn't work

10    we'll go to trial right away.  That way she doesn't have to

11    come twice.

12              MR. CASAGRANDE:  Sure.  The one issue is the release,

13    it seems like --

14              THE COURT:  It can't be telephonic.  She's going to

15    have to be here personally I would think, right?

16              MR. CASAGRANDE:  If you think so, then sure.

17              THE COURT:  It sounds like it's the kind of thing

18    where she needs to sit in a room and have somebody assess her

19    credibility, how she's going to appear on the stand, and have

20    Judge Pitman say, you know, look, this is what is going to

21    happen to you.  You are going to be cross-examined on the

22    following five things.  Are you prepared for that?  And have

23    him go back and forth with her and with Mr. Kadoe on whether or

24    not they're prepared for the emotional turmoil that a trial

25    creates, because sometimes trials don't result in what some
```

G67nkumc

1     people perceive as justice.

2           I mean, I hate to say that, but what people think of

3     as what would be a just result the jury may disagree with,

4     because the jury believes somebody who you think is a liar.  We

5     can't control the jury.

6           So I don't know how this woman appears.  I don't know

7     if she sits there and cries and she is telling the truth and

8     she believes she's telling the truth and Mr. Kadoe doesn't.

9     Somebody obviously is not telling the truth.  That is hard for

10    me to assess.

11          MR. CASAGRANDE:  I understand.  The point I was making

12    is she is willing to settle.  We went through all this.  The

13    only thing that is holding it up is the release.

14          THE COURT:  It sounds like, though, he's not going to

15    give the release because his view is he didn't do anything

16    wrong.  Why would he release her?

17          MR. CASAGRANDE:  Yeah.  I heard that, your Honor.

18          I will tell her to come.  Again, I am not sure --

19          THE COURT:  He wouldn't have personal jurisdiction

20    over her also unless he sued her in this case.  I mean, if he

21    sued her in this case, then there's personal jurisdiction.

22          MR. DUNN:  That is not --

23          THE COURT:  That has not been discussed?

24          MR. DUNN:  There's no counterclaim or anything.

25          THE COURT:  She is in Germany.  If this lawsuit goes

G67nkumc

1    away, it is very hard to get ahold of her.  She is in Germany.

2    I don't even know that Mr. Kadoe could sue her.

3              MR. CASAGRANDE:  I'm sorry.  Is that --

4              THE COURT:  I'm just throwing out sort of the

5    statement, which is to get a German citizen to appear in court

6    in the United States, I don't how that happens.  The defamation

7    occurred over here, all of the acts occurred over here.  You

8    could serve her, but whether she would actually ever appear I

9    don't know.

10             MR. KADOE:  We could ask to freeze the money, your

11   Honor.

12             THE COURT:  That is hard.  If you settle, it is going

13   to be very hard.

14             MR. KADOE:  I am not settling.  The insurance is

15   settling.

16             THE COURT:  I know.  But I don't know that you could

17   freeze the money.  The reality is once there is a settlement it

18   will go like that.

19             I don't know what the application is that would be

20   made, but it's tough to stop money flowing.  I'll tell you

21   that.  It is not impossible, but in this kind of case that is

22   not the likely outcome.  So the money would likely go wherever

23   it is going to go.

24             MR. KADOE:  Your Honor, I just want my name and my

25   family's name cleared.

G67nkumc

1          THE COURT:  What I am struggling with is I don't have

2     the answer for you.  I have thrown out a couple of ideas.

3     Maybe you should think about them.

4          I can tell you that a defamation claim could be very

5     messy.  A trial in this case would be messy business.  It's

6     already been filed, so you could get a judgment in this case.

7     I don't know if your legal fees are being paid by the insurer.

8     If they are, the insurer may have a problem if you don't settle

9     and then go to trial.  They may not cover you for the loss.  I

10    don't know.  I don't know how the policy reads.  So there may

11    be some complexities to the policy that may or may not occur.

12         It is possible that the LLC could settle through the

13    insurance company, and you personally wouldn't settle through

14    the insurance company.  You folks will think about that.

15         Here's what I am going to do.  You've already got an

16    open reference to Magistrate Pitman.

17         MR. DUNN:  We have been to Magistrate Pitman before on

18    a discovery issue and a settlement conference.

19         THE COURT:  So you guys have all met.

20         Were the parties part of that?

21         MR. DUNN:  Mr. Kadoe was present at the settlement

22    conference with the judge, but the plaintiff was not present.

23         Again, she lives in Germany.

24         THE COURT:  Give me a sense of the money that is at

25    issue here in terms of what the insurance company is willing to

G67nkumc

 1    pay her.

 2                MR. DUNN:  The settlement was for $175,000.

 3                THE COURT:  So she can fly over on that.  If she's got

 4    the possibility of $175,000, then she can fly over and meet in

 5    a room.  And I say that not having a view as to whether she

 6    has -- I have no idea how strong her claim is.  I am going to

 7    assume for the moment that it has some merit.  I understand,

 8    Mr. Kadoe, you totally disagree with that.  But you have an

 9    insurance company that is willing to pay $175,000, so it may be

10    that there is something there.

11                Is there no videotape?

12                MR. DUNN:  The events took place I think.  The issue

13    really is what Mr. Kadoe's involvement would be as opposed to

14    what went on in a private apartment that was occupied by his

15    brother.  That's really the sticking point in the case, and the

16    basis of the settlement.

17                There are arguments that the brother was an employee,

18    that the plaintiff was an employee, and there were issues and

19    enough things to talk about to keep both sides interested in a

20    settlement discussion as we have gotten to --

21                THE COURT:  Did you ever enter the apartment when your

22    brother had the camera set up?

23                MR. KADOE:  No, your Honor.

24                MR. DUNN:  The camera was --

25                MR. KADOE:  I didn't even know about it.

G67nkumc

| | |
|---|---|
| 1 | MR. DUNN:  -- a nanny cam. |
| 2 | The brother was arrested and prosecuted and entered a |
| 3 | plea a few months ago. |
| 4 | THE COURT:  A guilty plea? |
| 5 | MR. DUNN:  A guilty plea to a felony unlawful |
| 6 | surveillance. |
| 7 | THE COURT:  I mean, it is a hard case. |
| 8 | MR. KADOE:  Your Honor -- |
| 9 | THE COURT:  Yes. |
| 10 | MR. KADOE:  Just for common sense, she stayed in the |
| 11 | apartment for seven days.  They have 35 videos of her.  That |
| 12 | means she has to be in the bathroom ten times a day in order |
| 13 | for her to be taken on those videos. |
| 14 | THE COURT:  All I know is -- |
| 15 | MR. KADOE:  She staged the videos. |
| 16 | THE COURT:  I have no idea. |
| 17 | All I know is whether they -- I will put aside -- it |
| 18 | is a jury trial anyway, so if you guys go to trial.  It is not |
| 19 | even going to be me. |
| 20 | So I am not going to solve your problem today.  You've |
| 21 | got Mr. Kadoe, who feels very strongly about this, and I have |
| 22 | given you guys my view.  I would think the insurance company is |
| 23 | not going to go away without a release. |
| 24 | MR. DUNN:  They are going to need a release from the |
| 25 | plaintiff to pay the money. |

G67nkumc

1    THE COURT:  Yes.  She may want the money enough to get

2    the release from them.

3    MR. CASAGRANDE:  I think it is also worth pointing out

4    that there is a confidentiality agreement that is attached with

5    the settlement I believe was that discussed.

6    MR. DUNN:  We had a discussion about confidentiality

7    of all of this.

8    MR. CASAGRANDE:  Where the terms, the case, you know,

9    it wouldn't be further ever spoken about.

10   THE COURT:  Except I think Mr. Kadoe would need to be

11   able to speak about it from his perspective, which is there is

12   no finding that he ever had anything do with it or something

13   like that.

14   Otherwise, it would be a private settlement and it

15   sounds like there might be something there.

16   I am not going to be very helpful.  I don't want to

17   stay more.

18   MR. DUNN:  I think you have been fairly helpful at

19   least in narrowing the issues and discussing some of the

20   options, your Honor, and being good enough to speak to

21   Mr. Kadoe about it directly.

22   THE COURT:  Let's have you folks talk about these

23   options.

24   Mr. Kadoe, it would get very messy.  That's what I am

25   going to leave you with, which is if you think it is a mess

1   now, wait until there is a trial and the videos are shown.

2           What would happen is the press would show up, because

3   if there's nothing else happening in the courthouse, they are

4   all going to come.  They are going to believe, if it is your

5   brother, the newspapers could make it sound like you had

6   something do with it.  I am not suggesting that you are not

7   going to through your demeanor say to the jury, I didn't, I had

8   nothing do with this, I didn't know.

9           The jury may have sympathy for you, and they may

10  believe you and you may ultimately be victorious, but your

11  family in the meantime is going to have this all over the

12  newspaper.

13          So proceed with great caution to blow the settlement

14  up, because this is one of those situations where I understand

15  it is very ugly.  I think there are a couple of options in

16  terms of things that Mr. Kadoe could have where the

17  confidentiality agreement could have some ability to both let

18  him say that there was never any finding that he had anything

19  to do with this and that he gets dismissed from the case

20  formally prior to the settlement being entered into.

21          Those two things he could then wave around to his

22  heart's content without a trial, without all the videos being

23  shown, without all that mess.  In the meantime, if you guys can

24  agree to that, you don't need to have anybody come and meet.

25          If you can't agree to that, then I think it makes

1    sense to have you guys meets with Ms. Kunina in person.

2            MR. CASAGRANDE:  That is something that again we would

3    be open to.  Our main concern is the release.

4            THE COURT:  Yes.

5            MR. CASAGRANDE:  As I mentioned before, whatever we

6    can do to get there that everyone could agree to, we are open

7    to most avenues.

8            THE COURT:  I think Mr. Kadoe needs to think about the

9    realities of trial.  I mean, that's the rubber meeting the

10   road.  You need to think about how the plaintiff proves her

11   case.

12           Some of it's done without her even being on the stand,

13   right?  Some of it is done through other things, through the

14   videos, through the guilty plea, through whatever.

15           I understand then you will get up, you will say your

16   piece and whatever other witnesses there are who can

17   corroborate things.  I am just saying imagine how it's going to

18   happen, how it's going to go in a public courtroom, and you

19   folks need to talk about it.

20           I typically don't do settlement conferences, just

21   because I'm not very good at it.  Judge Scheindlin, who you

22   were in front of before, was very good.  She was a master at

23   it.  She started as a magistrate and she became a district

24   judge for 20 years or whatever it was, a long time.  She was a

25   master at it.  I settled cases before her myself when I was in

G67nkumc

1   private practice.

2          I am not very good at it.  I am a bull in a china

3   shop.  I just plow on through, as you can see.  That's why I

4   think magistrate Pitman would be better.

5          In the meantime, Mr. Kadoe, really think hard about

6   it.  There is a press group that lives downstairs in this

7   building.  All they do is look for is interesting trials.

8          We had a situation where we had, one of my very first

9   trials was a nanny trial.  It was a trial about a nanny who

10  allegedly had been beaten up by the father of the family.

11  Terrible allegations that she had been smacked around, once he

12  had gotten angry -- and he allegedly had an anger problem and

13  all of that.  What was the name of that case?  It was in the

14  papers.  I can't remember the name of it.  Anyway it was in the

15  pays.  You guys may remember this case.  It was in the papers.

16  This is now back in 2011, maybe 2012.

17         We had a trial because the family felt so strongly

18  about the allegations.  And the nanny testified, the father

19  testified, the mother testified, their 11-year-old daughter

20  testified.  And at the end of the day, the jury basically split

21  the verdict.

22         What she did was she said -- I forgot how it worked,

23  but one count was for assault -- Francois v. Mazer.  One count

24  for assault was found yes, one count for battery was found no,

25  and she was given $1500.

1    So that was not a victory for the husband because it
2    was very, very ugly because they had found that he had
3    assaulted her.  It was in the papers, and it was just ugly.
4        I just say that because they felt very, very strongly,
5    and I don't think they were able to leave feeling like they had
6    gotten justice.  They left feeling like the father had been
7    tarnished.
8        I have no idea what happened to this day in that
9    apartment.  All I'm saying is courtrooms are funny places with
10   juries.
11       We had a guy with a finger -- he lost the tip of his
12   finger -- last week, and he got $2 million for the tip of his
13   finger.  Juries do funny things.
14       Sometimes I think everything should be tried by the
15   judge and not tried by the jury.  I will give you the reference
16   to Magistrate Pitman.  You've already got one.  I am going to
17   make a new one.  So he knows, I am going call him on the phone
18   and tell him he may hear from you folks.
19       What is your schedule in this case?  Let me look back.
20   You have a bunch of deadlines coming up.
21       MR. DUNN:  Yes, your Honor.
22       THE COURT:  Why don't you folks take the next week to
23   talk and to think about this.  Why don't you let me know,
24   Mr. Casagrande, where things stand from your perspective in the
25   next week.

G67nkumc

1          MR. CASAGRANDE:  Sure.

2          THE COURT:  I'm sorry.  Yes?

3          MR. CASAGRANDE:  Yes.

4          THE COURT:  Fact discovery closes in two days.  You've

5   got everything done.  You've got a couple of things you are

6   going to do.

7          MR. CASAGRANDE:  Mr. Kadoe still needs to be deposed.

8   Back in April there was a discovery hearing in front of Judge

9   Pitman.  We recently, within the last two weeks, started

10  receiving the documents that were provided to us that Judge

11  Pitman ordered to be provided to us.  We really haven't been

12  able to go through them yet and set up a deposition date for

13  Mr. Kadoe.

14         THE COURT:  Mr. Kadoe you, can make yourself available

15  for a deposition in the next week sometime?

16         MR. KADOE:  I think so, yes.

17         THE COURT:  The fact discovery actually closes on

18  Friday.  Why don't we do this -- why don't we give you guys a

19  little bit of an extension, but only about a week.  We'll close

20  fact discovery, instead of Friday, which is the 10th, we will

21  close it on the 17th.

22         So fact discovery will close on June 1.  So between

23  now and June 17 if you don't settle you need to be deposed.

24  That's just the way this works.

25         You've got summary judgment motions coming up.  I have

G67nkumc

1    to tell you, I haven't studied all of the causes of action and

2    the elements, but it sounds like a very fact intensive case.

3    It doesn't sound like a very great case for summary judgment,

4    but there may be some element -- negligent entrustment, I don't

5    know if that's going to work, negligent supervision, I don't

6    know if that is going to work, intentional infliction of

7    emotional distress.

8            MR. DUNN:  I can narrow it down to -- essentially, the

9    arguments that come on summary judgment are a lack of notice of

10   the conduct at issue and a lack of vicarious liability for the

11   brother as an alleged employee when the events at hand are not

12   related to any employment.

13           THE COURT:  Yes.

14           MR. DUNN:  Those are the arguments.

15           THE COURT:  Actually, those are not bad arguments.

16           MR. DUNN:  They are subject to some argument on both

17   sides.

18           THE COURT:  It wasn't within the scope of his

19   employment, right?

20           MR. DUNN:  There are allegations in the complaint that

21   the ladies were given this apartment as part of their place

22   to --

23           THE COURT:  Live?

24           MR. DUNN:  Live.

25           THE COURT:  So there may be a motion for summary

G67nkumc

 1   judgment.  If there is, let's add on another week for that.

 2   Otherwise, it is due on June 16, so we will move that by a week

 3   as well, to the 23rd.

 4            Then we will move the opposition to July 18.

 5            We will move the reply to the 25th.

 6            Then we will keep the trial date.  That gives you a

 7   little bit more time.

 8            MR. DUNN:  Yes, your Honor.

 9            THE COURT:  In one week, Mr. Casagrande is going to

10   let me know if this case is going away sooner rather than

11   later.

12            MR. CASAGRANDE:  Will do.

13            THE COURT:  If not, I am going to get on the horn to

14   Magistrate Pitman, and you guys are going to set up the meeting

15   with this plaintiff.  That is going to have to occur between

16   now and September 12 when trial starts.

17            But in the meantime you may get that close.  I will

18   let Magistrate Pitman set that up with you because that will be

19   his schedule, not mine.  Mr. Kadoe?

20            MR. KADOE:  Yes, your Honor.

21            THE COURT:  Good luck, folks.  I know it is a tough

22   one.  We are adjourned.

23            MR. DUNN:  Thank you, your Honor.

24            (Adjourned)

25